**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RALPH NADER; DONALD N. DAIEN,
          *Plaintiffs-Appellants,*

v.

JANICE BREWER, in her official
capacity as Secretary of State of
Arizona,

          *Defendant-Appellee.*

No. 06-16251

D.C. No.
CV-04-01699-FJM

OPINION

Appeal from the United States District Court
for the District of Arizona
Frederick J. Martone, District Judge, Presiding

Argued and Submitted
April 15, 2008—San Francisco, California

Filed July 9, 2008

Before: Mary M. Schroeder, Richard R. Clifton, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Schroeder

**COUNSEL**

Robert E. Barnes, Milwaukee, Wisconsin, for plaintiffs-appellants Ralph Nader, et al.

Barbara A. Bailey, Phoenix, Arizona, for defendant-appellee Janice Brewer, et al.

**OPINION**

SCHROEDER, Circuit Judge,

**Introduction**

Ralph Nader and one of his supporters in Arizona, Donald Daien (collectively, "plaintiffs"), appeal from the district

court's grant of summary judgment to Janice Brewer, the Secretary of State of Arizona. Plaintiffs alleged that two provisions of Arizona's statutory election scheme—the requirement that circulators of nomination petitions be residents of Arizona and the requirement that nomination petitions be filed at least 90 days before the primary election—violated their rights to political speech and association under the First and Fourteenth Amendments. The case arose from Nader's efforts to appear on the 2004 Arizona general-election ballot as a presidential candidate. The district court upheld both petition requirements, holding that the burdens imposed on the exercise of plaintiffs' rights were not significant and were sufficiently justified by the state's interests.

The district court measured the burdens in terms of the effect the requirements had on Nader's ability to get on the Arizona ballot. The court held that these requirements were not a material cause of Nader's failure to get on the ballot in 2004 and the burdens were therefore minimal.

In this appeal Nader stresses that the burdens of the residency requirement should be measured in terms of the effect the requirement has on the rights of persons like himself who live outside Arizona and wish to circulate petitions in that state. Controlling Supreme Court authority and a persuasive opinion of the Seventh Circuit support Nader's position. *See Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182 (1999); *Krislov v. Rednour*, 226 F.3d 851 (7th Cir. 2000). Controlling Supreme Court authority also requires us to hold that the burdens imposed by Arizona's early filing requirement are severe and must be supported by compelling interests. *Anderson v. Celebrezze*, 460 U.S. 780 (1983).

Neither the district court nor this court has had the benefit of much documentation of the state's needs for the requirements. We conclude, on the basis of this record, when examined after the passage of the considerable amount of time expended completing the appellate process, that the burdens

are significant and that the state has not shown the requirements are sufficiently narrowly tailored to further compelling interests.

## I. Background

Ralph Nader, a resident of Connecticut, announced his independent candidacy for President of the United States on February 22, 2004. Donald Daien is one of Nader's supporters and is a registered voter in Arizona who wanted to vote for Nader and to serve as a presidential elector on Nader's behalf. Nader and Daien, along with other supporters, brought this action in August 2004 against Secretary of State Brewer, alleging that the residency requirement and the early filing deadline severely burdened the rights of expressive association and political speech of political candidates, potential petition circulators, and voters, in violation of the First and Fourteenth Amendments. They sought declaratory and injunctive relief.

### A. Arizona's Nomination-Petition System

In Arizona, a person who is not a member of a recognized political party may gain a place on the ballot by filing nomination petitions containing a prescribed number of signatures. Ariz. Rev. Stat. § 16-341(C), (E), (F), (I). The petitions are filed for the office of presidential elector rather than for the presidential candidate; the petitions designate the presidential candidate and the names of ten individuals who would serve as electors for that candidate. *Id.* § 16-341(G), (H).

The same statute establishes the total number of signatures required for each political office, which is 3% of the registered voters in the political subdivision for which the candidate is nominated, who are not members of recognized political parties. *Id.* § 16-341(E), (F). Each signature must be witnessed by the petition circulator. *Id.* § 16-321(D). In 2004,

the number of signatures required for the office of presidential elector in Arizona was 14,694.

Only persons qualified to register to vote in Arizona can circulate petitions. *Id.* §§ 16-101, 16-321(D). In order to be qualified to register to vote, a person must, among other things, be a resident of Arizona and must have been a resident at least twenty-nine days before the election ("the residency requirement"). *Id.* § 16-101(A)(3). Under this statutory limitation, all non-residents of Arizona, including Nader himself, are prohibited from circulating petitions in support of Nader's candidacy.

Nomination petitions must be filed with the Secretary of State's office no later than 90 days before the primary election ("the filing deadline"). *Id.* §§ 16-311(A), (E), 16-341(C). This places the filing deadline 146 days before the general election. In 2004, the general election was held on November 2, the primary election was held on September 7, and the filing deadline was June 9.

An Arizona registered voter may challenge the validity of a candidate's petitions by bringing an action in superior court. *Id.* § 16-351. Such action must be brought within ten business days of the filing deadline, and the superior court must hear and decide the action within ten calendar days of its filing. *Id.* § 16-351(A). The decision is appealable only to the Arizona Supreme Court, and it must be appealed within 5 calendar days. *Id.* The Supreme Court must decide the appeal promptly. *Id.*

At least 45 days before the general election, the state must prepare a proof of a sample ballot. *Id.* § 16-461(A). According to the state's affidavits, the state also mails ballots to overseas members of the military 45 days before the general election. Voters can cast early ballots beginning 33 days before the general election; in 2004, early voting began on September 30.

As we construe the data provided by the state, the timeline for the 2004 election was as follows:

Presidential Preference Election...... February 3

Filing Deadline for Nader.................June 9

Primary Election...............................September 7

Deadline to Prepare Proof
of Sample Ballot...............................September 18

First Day of Early Voting.................September 30

General Election...............................November 2

## B.   Proceedings Below

Nader filed his Arizona presidential nomination petitions with the Secretary of State on June 9, 2004. Two Arizona voters then filed an action on June 23 in the Superior Court in Maricopa County, challenging his eligibility. They alleged that his petitions did not provide the required number of valid signatures, that the petitions included signatures forged by circulators, that some petitions had been circulated by felons, and that the petitions contained falsified addresses of circulators. Nader conceded that the petitions did not meet the signature requirements and on July 2, 2004, withdrew his candidacy for the Arizona ballot.

In August 2004, plaintiffs brought this action for declaratory and injunctive relief, alleging that the residency requirement and the early filing deadline severely burdened the rights of expressive association and political speech of political candidates, potential circulators, and voters, in violation of the First and Fourteenth Amendments, and that neither regulation could survive strict scrutiny. They sought a declaration that Arizona's statutory election scheme was unconstitutional

as applied to them and an injunction barring the enforcement of the statutory deadlines in the 2004 election. The district court denied plaintiffs' motion for preliminary injunctive relief.

Both sides moved for summary judgment in January of 2006. The state argued that the restrictions did not impose a severe burden on plaintiffs' rights. It argued further that even if the burden imposed was severe, both the residency and filing deadline requirements should survive strict scrutiny. The state urged that the residency requirement was narrowly tailored to further the state's interest in preventing fraud in the election process, in order to ensure that circulators could be located and subpoenaed in time for petition challenges. With respect to the filing deadline, the state contended that it was narrowly tailored to further the state's administrative and statutory obligations, given the deadlines related to early voting and sample ballots and the state's schedule for printing the ballots.

In support of its 2006 summary judgment motion, the state submitted affidavits from Joseph Kanefield, the State Election Director, and Karen Osborne, the Director of Elections for Maricopa County, describing the planned schedule for the 2008 election. Osborne explained the procedures that would be utilized for the optical-scan ballots used in Maricopa and Pima Counties, which together represent almost 76% of the state's registered voters. According to Osborne, Maricopa County planned to begin the layout of its general-election ballot as soon as the June 11 filing deadline passed. The first candidates listed on the ballots would be those for the office of presidential elector. The layout of the remainder of the ballot thus depended on the number of candidates for that office. The judges and state initiatives, as well as the county, city, and school ballot propositions, were to be listed on the back of the ballot.

Maricopa County's plan was to print its 2008 ballots in two stages. It would send the back side of the ballot for printing

on August 20. The printing of the front side would begin on September 16, after the candidates for the offices listed on the front side were determined in the primary election. The county would receive the completed ballots from the printer no later than September 24, to allow time for testing and inspecting the ballots, distribution to early voting sites, and mailing for early voting, to begin October 2. The affidavit stated that ballots undergo "Logic" and "Accuracy" tests in each precinct in October.

The only explanation for why the names of the presidential candidates for the general election had to be known in June, three months before the primary, was that the ballot paper had to be ordered about five months before the election. According to the election officials' affidavits, the paper for the ballots would be ordered in late May or early June to ensure availability. The state's motion asserted that if it were to find out later than June that ten presidential electors needed to be added to the ballot, the ballot would require two pages instead of one, and, as a result, Maricopa County would be unable to acquire the additional paper or print the ballots in time. According to the affidavits, however, there are a total of more than 400 state and local offices and dozens of other ballot measures on the general-election ballot. So far as this record indicates, the candidates for all offices, from presidential electors to local officials, are on the same ballot. The state did not explain with any specificity how many offices and measures would appear on a ballot in any given precinct. Nor did the state explain when the nature and number of initiative measures, school bond measures, and other types of ballot measures, which may vary in number and size, need to be known.

The state's affidavits did not fully deal with Arizona's history of moving the filing deadline back. The state legislature in 1993 moved the filing deadline from a date 10 days after the primary election to a date 75 days before the primary election. *See* Act of Apr. 14, 1993, 1993 Ariz. Sess. Laws ch. 98, sec. 24, § 16-341(C). The legislature in 1999 again moved

back the deadline, this time to 90 days before the primary election. *See* Act of May 13, 1999, 1999 Ariz. Sess. Laws ch. 224, sec. 1, § 16-311(A). The record indicates that the 1999 change was made to allow more time for petition challenges, but there is no information in the record about the reasons the deadline was moved in 1993.

Kanefield's affidavit dealt with the history of ballot access by candidates. It declared that since 1994, eight candidates for the state legislature, one candidate for U.S. Representative in Congress, one candidate for the U.S. Senate, and one candidate for governor of the state of Arizona have gained access to the general-election ballot using the procedure provided by section 16-341. Of these offices, only two are voted on statewide. Since the filing deadline was moved in 1993, no independent presidential candidate has achieved a place on Arizona's ballot.

The state also submitted evidence of five criminal prosecutions that the state has pursued for petition fraud. The state did not assert that any of the prosecutions had to do with non-resident circulators.

The district court in June 2006 granted the state's motion for summary judgment and denied plaintiffs' motion for summary judgment. The district court rejected the state's threshold position that plaintiffs' challenge to the requirements as they applied to the 2004 election was moot, applying the exception to the mootness doctrine for problems "capable of repetition, yet evading review." *See Moore v. Ogilvie*, 394 U.S. 814, 816 (1969) (internal quotation marks omitted) (quoting *S. Pac. Terminal Co. v. Interstate Commerce Comm'n*, 219 U.S. 498, 515 (1911)). The state does not challenge this conclusion on appeal.

With respect to the merits of plaintiffs' claims, the district court viewed the burden on plaintiffs' rights as minimal. It reasoned that even with the residency requirement for petition

circulators, there were still several million Arizona residents eligible to vote and hence to circulate petitions. Regarding the filing deadline, the district court observed that states now hold their presidential primaries much earlier in the election year than they did when the Supreme Court held in *Anderson*, 460 U.S. at 806, that an early filing deadline impermissibly burdened independent voters' access to candidates of their choice. The district court reasoned that the Supreme Court's concern about maintaining the ability of an independent to announce a candidacy as a response to developments in major-party candidates' campaigns was less valid than it was when *Anderson* was decided. The district court concluded that the filing deadline provided a "reasonably diligent" candidate enough time to gather the required number of signatures under the standard this court utilized in *Libertarian Party of Washington v. Munro*, 31 F.3d 759, 762 (9th Cir. 1994).

The district court ruled both restrictions constitutional, holding that any burden imposed on plaintiffs' rights by the residency requirement was justified by the state's compelling interest in protecting the integrity of the election process, and any burden imposed by the filing deadline was justified by the state's compelling interest in allowing sufficient time to verify signatures, permit challenges to petitions, and print and distribute ballots. Because the court did not find that a severe burden was imposed by the restrictions, it did not hold the state to the heightened requirement of proving the restrictions were narrowly tailored to serve compelling state interests.

On appeal, plaintiffs argue that the court should have applied strict scrutiny to both restrictions because each severely burdens plaintiffs' rights, and that under strict scrutiny, neither is narrowly tailored to further a compelling state interest.

## II.   Analysis

[1] The Supreme Court has held that when an election law is challenged, its validity depends on the severity of the bur-

den it imposes on the exercise of constitutional rights and the strength of the state interests it serves. In the seminal case of *Anderson*, 460 U.S. at 789, the Court held that, in considering a constitutional challenge to an election law, a court must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments" against "the precise interests put forward by the State as justifications for the burden imposed by its rule." The Court struck down Ohio's March filing deadline for independent presidential candidates because the state's "minimal" interests did not justify the "extent and nature" of the burdens imposed by the deadline. *Id.* at 806.

[2] The Court clarified the standard in *Burdick v. Takushi*, 504 U.S. 428, 434 (1992), when it held that the severity of the burden the election law imposes on the plaintiff's rights dictates the level of scrutiny applied by the court. In *Burdick*, the Court upheld a prohibition on write-in voting in Hawaii, holding that the limited burden imposed was justified by Hawaii's interests in preventing factionalism and the manipulation of parties' primary elections through write-in campaigns. *Id.* at 438-40, 441-42. The Court held that an election regulation that imposes a severe burden is subject to strict scrutiny and will be upheld only if it is narrowly tailored to serve a compelling state interest. *See id.* at 434. It held that a state's "important regulatory interests" are usually sufficient to justify election regulations that impose lesser burdens. *Id.* The Court recently reaffirmed these principles in *Washington State Grange v. Washington State Republican Party*, ___ U.S. ___, 128 S. Ct. 1184, 1191-92 (2008).

[3] The leading case in our circuit is *Libertarian Party*, where we upheld the state of Washington's filing deadline for minor-party candidates that was only weeks before the deadline established for major-party candidates. 31 F.3d at 762, 765. We held that the burden on plaintiffs' rights should be measured by whether, in light of the entire statutory scheme regulating ballot access, "reasonably diligent" candidates can

normally gain a place on the ballot, or whether they will rarely succeed in doing so. *Id.* at 761-62 (internal quotation marks omitted) (quoting *Storer v. Brown*, 415 U.S. 724, 742 (1974)). To determine the severity of the burden, we said that past candidates' ability to secure a place on the ballot can inform the court's analysis. *See id.* at 763.

With that legal background, we turn to each of the challenged Arizona election restrictions.

## A.  Residency Requirement for Petition Circulators

The first provision at issue here is the requirement that petition circulators be residents of the state. Petition circulators must be "qualified to register to vote in [Arizona]." Ariz. Rev. Stat. § 16-321(D). The provision enumerating the requirements for voter registration in turn provides, in relevant part: "Every resident of the state is qualified to register to vote if he . . . [w]ill have been a resident of the state twenty-nine days next preceding the election, . . . ." *Id.* § 16-101(A)(3).

[4] Plaintiffs contend that such a residency requirement unconstitutionally burdens their rights to speech and association because it interferes with substantially more core political speech than is necessary. The leading decision on qualifications for petition circulators is *Buckley*, 525 U.S. 182, which involved a challenge to Colorado's regulation of initiative-petition circulators. One of the restrictions considered in that case was a requirement that circulators actually be registered to vote in the state. *Id.* at 186. The Court first stated, as it had done in *Meyer v. Grant*, that "[p]etition circulation . . . is 'core political speech,' because it involves 'interactive communication concerning political change,' " and that First Amendment protection for such interaction is therefore " 'at its zenith.' " *Id.* at 186-87 (quoting *Meyer v. Grant*, 486 U.S. 414, 422, 425 (1988)). The Court then determined that the registration requirement imposed a severe burden on the speech rights of individuals involved with the initiative pro-

cess because it significantly decreased the pool of potential circulators, which in turn limited the size of the audience that could hear the initiative proponents' message. *See id.* at 192 & n.12, 193-96.

**[5]** The state attempted to justify the burden as necessary to ensure circulators were subject to the state's subpoena power, but the Court found that the state's separate residency requirement achieved the same end, and agreed with the Tenth Circuit's statement that it did so "more precisely." *Id.* at 196-97. The Court expressly did not decide the validity of the separate residency requirement because it was not challenged in that case. *See id.* at 197. (Arizona's residency provision appears similar to the residency requirement described in *Buckley* and is, of course, less restrictive than the provision invalidated in *Buckley* because the Arizona provision does not require circulators to be actual registered voters. While the district court correctly observed that there remain millions of potential Arizona circulators, the residency requirement nevertheless excludes from eligibility all persons who support the candidate but who, like Nader himself, live outside the state of Arizona. Such a restriction creates a severe burden on Nader and his out-of-state supporters' speech, voting and associational rights. Because the restriction creates a severe burden on plaintiffs' First Amendment rights, strict scrutiny applies. This is a conclusion we believe to be mandated by the Supreme Court in *Buckley*. The Court held in *Buckley* that significantly reducing the number of potential circulators imposed a severe burden on rights of political expression. *See id.* at 194-95.

This conclusion is also supported by two more recent circuit decisions. In *Chandler v. City of Arvada*, the Tenth Circuit held that a city ordinance requiring petition circulators to be residents imposed a severe burden on the speech rights of initiative proponents. 292 F.3d 1236, 1238-39, 1241-42 (10th Cir. 2002). It applied strict scrutiny. The court stated that "[s]trict scrutiny is applicable where the government restricts

the overall quantum of speech available to the election or voting process . . . ." *Id.* at 1241-42 (internal quotation marks and citation omitted). The court specifically ruled that strict scrutiny must be applied when the rights of potential petition circulators are restricted. Quoting from an earlier Tenth Circuit decision, it said that strict scrutiny must be " 'employed where the quantum of speech is limited due to restrictions on . . . the available pool of circulators or other supporters of a candidate or initiative, as in [*Buckley*] and *Meyer.*' " *Id.* (quoting *Campbell v. Buckley*, 203 F.3d 738, 745 (10th Cir. 2000)).

In *Krislov*, the Seventh Circuit held that an in-district residency requirement, which operated as an in-state residency requirement for a candidate for the U.S. Senate, severely burdened candidates' rights to association and ballot access. 226 F.3d at 855-56, 857, 860-62. The court explained,

> What is particularly important in this case [in assessing the severity of the burden] . . . is the number of people the . . . requirements exclude from gathering signatures and thus disseminating the candidates' political message . . . . [The residency requirement] places a substantial burden on the candidates' First Amendment rights by making it more difficult for the candidates to disseminate their political views, to choose the most effective means of conveying their message, to associate in a meaningful way with the prospective solicitors for the purposes of eliciting political change, to gain access to the ballot, and to utilize the endorsement of their candidacies which can be implicit in a solicitor's efforts to gather signatures on the candidates' behalf.

*Id.* at 860, 862 (citing *Buckley*, 525 U.S. at 193 n. 15).

A brief Eighth Circuit opinion came to the opposite conclusion and upheld a residency requirement for initiative-petition circulators. *See Initiative & Referendum Institute v. Jaeger*,

241 F.3d 614, 617 (8th Cir. 2001). *Krislov* had been decided a few months earlier, but *Jaeger* did not cite it. The Tenth Circuit in *Chandler* did cite *Jaeger* and disagreed with it. *See Chandler*, 292 F.3d at 1244. We do not find *Jaeger* persuasive.

**[6]** The state contends here that if the standard is strict scrutiny, then the restriction is justified by the state's compelling interest in preventing fraud in the election process. It points to the evidence it presented of past election fraud in Arizona. A state's interest in ensuring the integrity of the election process and preventing fraud is compelling. *See Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam). We therefore agree with Arizona that the state's interest in preventing election fraud is a compelling one. The state, however, bears the burden of proving that a regulation is narrowly tailored. *See ACLU of Nev. v. Heller*, 378 F.3d 979, 997 (9th Cir. 2004).

The state contends that this restriction is narrowly tailored to ensure that circulators are subject to the state's subpoena power, and that the state can locate them within the ten-day period allotted for petition challenges. Plaintiffs argue that requiring circulators to submit to jurisdiction by agreement would achieve the same end and would be more narrowly tailored to further the state's interest in preventing fraud.

**[7]** Federal courts have generally looked with favor on requiring petition circulators to agree to submit to jurisdiction for purposes of subpoena enforcement, and the courts have viewed such a system to be a more narrowly tailored means than a residency requirement to achieve the same result. *See Chandler*, 292 F.3d at 1242-44 (holding that city residency requirement was "substantially broader than necessary" to ensure the integrity of the petition process in part because the city could instead require circulators to submit to jurisdiction of the city for subpoena enforcement); *Krislov*, 226 F.3d at 866 n.7 (invalidating residency requirement and suggesting agreement to submit to jurisdiction as permissible restriction

to further state's interest in preventing fraud); *Frami*, 255 F. Supp. 2d at 970 (noting that requiring petition circulators to agree to submit to jurisdiction for subpoena enforcement was a "less onerous method[ ]" than a residency requirement for serving the state's interest in ensuring circulators were subject to the state's jurisdiction). *Cf. Kean v. Clark*, 56 F. Supp. 2d 719, 733 (S.D. Miss. 1999) (holding that a residency requirement was narrowly tailored, but without considering any "consent to jurisdiction" alternative).

**[8]** The state responds that petition circulators could conceivably be spread throughout the country, and that given the narrow timeframe for petition challenges in Arizona, such a "consent to jurisdiction" system would be unworkable. The state does not provide any evidence, however, to support this contention, observing only that professional petition circulators can be "nomadic." Nor did the state ever contend that its history of fraud was related to non-resident circulators, a history that might justify regulating non-residents differently from residents. *See Krislov*, 226 F.3d at 866 n.7 ("[I]f the use of non-citizens were shown to correlate with a high incidence of fraud, a State might have a compelling interest in further regulating noncitizen circulators."); *Frami*, 255 F. Supp. 2d at 970 (holding a residency requirement was not narrowly tailored to serve the state's interest in preventing fraud because defendant had "not even alleged that the state has experienced problems in the past with non-resident petition circulators or that such circulators are more likely to engage in fraud than in-state . . . circulators.").

**[9]** We conclude that the state did not meet its burden of showing that this residency requirement is narrowly tailored to further the state's compelling interest in preventing fraud. On the basis of the record before us, the requirement cannot be sustained.

### B.   Filing Deadline

The second provision at issue is the requirement that petitions be filed 90 days before the primary election. Plaintiffs

argue that this deadline imposes a severe burden on their speech, association and voting rights and that the state has not shown that the deadline is narrowly tailored to further a compelling interest.

**[10]** In *Anderson*, the Supreme Court struck down Ohio's March filing deadline for an independent presidential candidate's nomination petition. 460 U.S. at 806. In evaluating the severity of the burden imposed, the Court observed that the deadline deprived independent candidates of their ability to respond to developments in the course of the campaigns of the major-party candidates. *See id.* at 791-92, 791 n.12. The Court observed that particular independent candidacies, and voter support for those candidacies, sometimes occur as a reaction to the particular nominees of the major parties. *See id.* It also found that collecting 5,000 signatures far in advance of the general election was difficult, since interest levels were low and volunteers were difficult to recruit. *See id.* at 792. The Court concluded that none of the state's asserted interests justified the "extent and nature" of the burden imposed by the March filing deadline. *Id.* at 806.

In this case, the district court concluded that *Anderson* was not controlling. The court reasoned that Arizona's 2004 presidential preference election was held well in advance of the filing deadline, that the major parties' candidates and platforms were well-known, and the level of public interest was high by then. The district court dismissed the significance of the concerns in *Anderson* because they were not present in the 2004 election.

The 2004 election, however, may not have been representative of future elections, where the major party candidates may not be determined so far in advance of the filing deadline. *Anderson* remains binding Supreme Court authority. We conclude that the concerns expressed in *Anderson* may well remain significant, and in any event, we are not free to disregard them.

**[11]** The historical evidence of ballot access in Arizona further supports this conclusion. *See Libertarian Party*, 31 F.3d at 763 (looking to historical experience to support conclusion that ballot-access scheme did not severely burden minor-party candidates' rights). Since 1993, when Arizona changed its filing deadline from 10 days after the primary election to 75 days before the primary election, no independent presidential candidate has appeared on Arizona's ballot. This experience suggests that the regulations impose a severe burden that has impeded ballot access.

The state tries to maintain that this record supports the early deadline for presidential candidates, because independent candidates for other offices have gained ballot access. Yet candidates for president are national candidates and thus situated differently from candidates for state offices, or even other federal offices in Arizona; presidential candidates in Arizona are required to file more signatures than candidates for local offices. Evidence regarding independent candidacies for other offices is not particularly persuasive and certainly not conclusive in this case.

The state relies upon *Libertarian Party*. There we upheld a Washington statute requiring minor-party candidates to obtain 200 signatures for statewide offices or 25 signatures for other offices by July 4 of the election year. *Libertarian Party*, 31 F.3d at 760-61. The case thus involved a comparatively small number of signatures and a date closer to the major parties' conventions. For those reasons we concluded that only a de minimis burden was imposed. *See id.* at 763. We explained why the restrictions were much less burdensome than those in *Anderson*. *See id.* at 762. We pointed out that collecting such a small number of signatures just four to five weeks before the selection of major-party candidates was not particularly difficult. *See id.* We also deemed it significant that the plaintiffs challenging the regulation had all been able to announce and file on time, and that they could not identify

any candidates who had been denied ballot access because of Washington's procedures. *Id.* at 763.

In *Anderson*, by contrast, where the plaintiff was forced to file petitions in March, five months before the major-party candidates were to be decided, 460 U.S. at 790-91, and had been unable to get his name on the ballot, *id.* at 782-83, the early filing deadline was struck down, *id.* at 806. Nader's predicament is like that of the plaintiff in *Anderson*. Here, the signature requirement is greater and the deadline tighter than in *Libertarian Party*. Unlike the candidates in *Libertarian Party*, independent presidential candidates in Arizona have not been able to get on the ballot. The Sixth Circuit's opinion in *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579, 590-91 (6th Cir. 2006), contains a good discussion of the various circuit court decisions in cases considering and striking down early filing deadlines in state elections.

**[12]** For these reasons we must conclude that the Arizona deadline imposes a severe burden on plaintiffs' rights. Because a severe burden is imposed, strict scrutiny applies to the filing deadline as well. *See Anderson*, 460 U.S. at 792, 795, 806.

**[13]** The state next contends that even under strict scrutiny, the filing deadline is constitutional because it is necessary in order for the state to meet its various deadlines for petition challenges, sample ballots, early voting ballots and overseas military personnel, as well as for the layout and printing of ballots.

**[14]** When we examine the timeline, however, together with the relatively small impact of the presidential election on the overall length of Arizona's general-election ballots, we cannot say that the state has justified the early filing deadline. The state asserts that Arizona's general election ballots include over 400 different federal, state, and local elected offices and dozens of local ballot measures. The state con-

tends in effect that it can accommodate all the other offices and initiatives, but not the addition of ten electors for the office of President. This does not appear on its face to be an internally consistent position. The state has not explained when and how it learns of the number of other offices and initiatives that must be placed on the general-election ballot. Presumably, the results of the September primary election would have some effect on the length of the general-election ballot as well, but the state has not documented the process in sufficient detail to determine what effect it would or would not have. The state made the conclusory assertion that it must order the ballot paper by early June to ensure availability, but it has not provided documentation or any other evidence supporting this conclusion.

**[15]** There is thus no satisfactory explanation in the record as to why the state needs the full amount of time between the filing deadline for independent candidates, which in 2004 fell on June 9, and its first statutory deadline of printing a sample ballot 45 days before the general election, which in 2004 fell on September 18, to prepare the ballots for the general election. In light of the state's ability to put together the general-election ballot after the primary in September, and its failure adequately to demonstrate why the petition filing deadline must be so early, the state has on this record failed to show that the deadline is narrowly tailored to further compelling administrative needs.

**Conclusion**

Election cases are difficult. The historical background for such litigation changes rapidly. The district court was faced with a serious challenge to ballot-access requirements that have proved difficult for courts to evaluate, given both the state's compelling interests in preventing fraud and providing orderly election administration, and the Constitution's mandate for free political expression and participation that require such ballot-access restrictions to survive strict judicial scru-

tiny. Although the district court did not agree with plaintiffs that the requirements constituted serious impediments to the exercise of their constitutional rights, we conclude that the burdens are serious and the restrictions are not sufficiently narrowly tailored to serve the state's compelling interests. The state was given every opportunity to meet the heavy burden that the district court or a higher court might eventually determine that it must shoulder under strict scrutiny. On the basis of the record before us, the state did not do so.

The judgment of the district court is **REVERSED** and **REMANDED** with instructions to enter summary judgment in favor of plaintiffs.