# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-3434

_____

| | | |
|---|---|---|
| Initiative & Referendum Institute;<br>John Michael; Ralph Muecke;<br>Progressive Campaigns; Americans<br>for Sound Public Policy; US Term<br>Limits, | * <br> * <br> * <br> * <br> * <br> * | |
| Appellants, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of North Dakota. |
| Alvin Jaeger, Secretary of State<br>of the State of North Dakota, | * <br> * <br> * | |
| Appellee. | * | |

_____

Submitted: October 18, 2000

Filed: February 15, 2001
_____

Before MURPHY, HEANEY and BYE, Circuit Judges.

_____

HEANEY, Circuit Judge.

The appellants S Initiative & Referendum Institute, John Michael, Ralph Muecke, Progressive Campaigns, Americans for Sound Public Policy, and U.S. Term Limits, Inc. S sought a declaratory judgment to have two provisions of the North Dakota initiated measure and referendum laws declared unconstitutional as violating

the First and Fourteenth Amendments. The appellants challenge the requirement that all those who circulate petitions must be North Dakota residents and the prohibition of payment of petitions circulators on a "per signature," or commission, basis. The district court denied the appellants' motion for summary judgment and dismissed their complaint for declaratory relief. Because these two regulations are designed to protect the integrity of signature gathering, do not unduly hinder the circulation of petitions, and comport with the recent Supreme Court decision in Buckley v. American Constitutional Law Foundation, Inc., 525 U.S. 182 (1999), we affirm.

## I. BACKGROUND

Over half the states provide for an initiative or referendum process. Many states adopted initiative measures in the early 1900s, as part of the Progressive Movement's efforts to remove corruption and special interest money from politics. See generally David S. Broder, Democracy Derailed: Initiative Campaigns and the Power of Money (2000) (describing history of initiative process and critiquing recent involvement of special interest money in initiative process).

In 1914, North Dakota's Constitution was amended, reserving the right of the people to initiate legislation. In the last two decades, certain measures have been enacted regarding the North Dakota initiative process. In 1979, the North Dakota Constitution was amended to provide that only "qualified electors" could circulate initiative petitions. The North Dakota statutes define a "qualified elector" as "a citizen of the United States who is 18 years of age or older [and] a resident of this state" who has resided in the precinct for 30 days. N.D.Cent. Code § 16.1-01-04 (1) (1997). Further, in 1987 the North Dakota legislature enacted a statute, which allowed petition circulators to be paid, but prohibited payment "on a basis related to the number of signatures obtained." N.D.Cent. Code § 16.1-01-12 (11) (1997).

In 1998, the appellants brought this action, seeking to have both the residency requirement and the prohibition on commission payments declared unconstitutional. The appellants are non-profits involved in the initiative process; a for-profit business involved in qualifying proposed initiatives for the ballot; a non-resident who would like to circulate petitions in North Dakota; and a North Dakota resident who would prefer to pay petition circulators on a per signature basis.

## II. ANALYSIS

The Supreme Court has stated that "'no litmus- paper test' will separate valid ballot-access provisions from invalid interactive speech restrictions" because there is "'no substitute for the hard judgments that must be made.'" Buckley, 525 U.S. at 192 (quoted case omitted). While states have "considerable leeway to protect the integrity and reliability of the initiative process," at the same time, the First Amendment requires vigilance "to guard against undue hindrances to political conversations and the exchange of ideas." Id. at 191-92. The Supreme Court has developed a sliding standard of review to balance these two interests. Severe burdens on speech trigger an exacting standard in which regulations must be narrowly tailored to serve a compelling state interest, whereas lesser burdens receive a lower level of review. See Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358-59 (1997) (laying out flexible standard); But cf. Buckley, 525 U.S. at 208 (Thomas, J., concurring) (questioning whether serious and lesser burdens can be adequately distinguished).

### A. Residency Requirement

In Buckley, the Supreme Court, while striking down a voter registration requirement for petition circulators, assumed without deciding that state residency requirements for petition circulators were permissible. The court concluded, however, that Colorado's registered voter requirement was not narrowly tailored to the state's objective of preventing signature fraud and establishing that a petition had grassroots

support in the state.  See 525 U.S. at 194-97;  See also Bernbeck v. Moore, 126 F.3d 1114, 1117 (8th Cir. 1997) (holding that voter registration requirement violated First Amendment).  The Supreme Court assumed that a residency requirement would serve the state's goals better, and in a less restrictive way, because a residency requirement would allow the state to locate and subpoena circulators.  See Buckley, 525 U.S. at 196.  However, the Supreme Court never squarely confronted the issue because it had not been properly raised.   We therefore conduct an independent analysis as to the residency requirement's constitutionality.

As the State has a compelling interest in preventing fraud and the regulation does not unduly restrict speech, we conclude that the residency requirement is constitutional. The residency requirement allows North Dakota's Secretary of State to protect the petition process from fraud and abuse by ensuring that circulators answer to the Secretary's subpoena power.  The State contends that by having circulators available to answer questions regarding fraud and abuse, it will be able to police the petition process more easily.  In terms of empirical evidence, the State points to a 1994 incident in which over 17,000 signatures had to be invalidated.  Two Utah residents who were involved in petition irregularities left the State, and the matter was never fully resolved. Second, the State argues that requiring circulators to be state residents ensures that a provision has grass-roots support in North Dakota and that the initiative process is not completely taken over by moneyed, out-of-state special interest groups.

The appellants argue that having to use state residents as circulators burdens their First Amendment rights by making it more costly and time consuming to collect signatures.  There is no evidence in the record, however, regarding what the additional cost to the appellants would be.  Further, all 476,000 of North Dakota's eligible voters may circulate petitions, unlike the situation in Buckley, where many Colorado residents would have been unable to engage in petition circulation.  Since the Secretary of State began keeping statistics on the success rate of signature campaigns in 1985, it appears that approximately 70% of the of the petitions circulated have qualified to be placed on

-4-

the ballot. This high success rate demonstrates that no severe burden has been placed on those wishing to circulate petitions.

Appellants assert that the residency requirement prevents non-North Dakota residents from engaging in political speech by forbidding them from circulating petitions. However, many alternative means remain to non-residents who wish to communicate their views on initiative measures. Non-residents are still free to speak to voters regarding particular measures; they certainly may train residents on the issues involved and may instruct them on the best way to collect signatures; and they may even accompany circulators. See Attorney General Nicholas J. Spaeth to Wayne Goter (Oct. 2, 1991) (State's App. 3-4). The one restriction is that out-of-state residents cannot personally collect and verify the signatures, and that restriction is justified by the State's interest in preventing fraud.

Since the Buckley decision, two district courts have considered the constitutionality of residency requirements. In Kean v. Clark, 56 F. Supp. 2d 719, 728-29, 732-34 (S.D.Miss. 1999), the district court concluded that although a voter registration requirement would be unconstitutional, a residency requirement was permissible. The district court applied strict scrutiny to the residency requirement and concluded that the residency requirement was narrowly tailored and backed by a compelling interest in preventing fraud. A district court in Maine came to the same conclusion in Initiative & Referendum Institute v. Secretary of State of Maine, No. Civ. 98-104-B-C, 1999 WL 33117172, at *16 (D. Me. April 23, 1999).

B.  Commission Payments

In <u>Meyer v. Grant</u>, 486 U.S. 414, 428 (1988), the Supreme Court held that Colorado's statute banning the payment of petition circulators was  unconstitutional. The Court stated that there was no evidence that paid professional circulators would have any more incentive to commit fraud than volunteers who were eager to have an initiative placed on the ballot.  <u>See</u> <u>id</u>. at 426.  Further, the Court held that the flat ban on paid circulators restricted political expression because it limited the number of people who could convey a political message and made it less likely that a measure would garner the necessary signatures to be placed on the ballot.  <u>See</u> <u>id</u>. at 422-23. The Court has not discussed the extent to which a state can permissibly regulate the payment structure for petition circulators.

The statute at issue in this case only regulates the way in which circulators may be paid.  The statute does not involve the complete prohibition of payment that the Supreme Court ruled unconstitutional.   Since <u>Meyer</u>, two district courts have considered the question of commission payments, each reaching different results based on the evidence that the state and the circulators put forth.  In <u>Initiative & Referendum Institute</u>, 1999 WL 33117172, at *8-*9, the plaintiffs introduced evidence that some circulators would not work on a flat fee basis.  Therefore, the district court ruled that a trial was necessary to determine whether the prohibition on commission payments would severely burden the initiative process.  If the burden were found to be severe, strict scrutiny would apply and then the court would need to examine the State's evidence that increased fraud would result.  In <u>LIMIT v. Maleng</u>, 874 F. Supp. 1138, 1140 (W.D.Wash. 1994), the state did not produce any evidence to support its contention that paying circulators on a per signature basis would encourage fraud. Therefore, the district court found that the prohibition on payment per signature was an unconstitutional infringement on freedom of political speech.

Examining the record in this case, we conclude that the State has produced sufficient evidence that the regulation is necessary to insure the integrity of the initiative process. In 1987, the Legislature passed § 16.1-01-12(11) in response to problems that occurred with an initiative that had been placed on the ballot in November 1986. State Representative Linderman stated, in regard to a 1986 signature campaign, that "students were being paid 25¢/signature. There were reported irregularities--taking names out of the phone book, etc." The limited legislative history available shows that the legislators were aware of, and contemplated, the bill's effect on the circulation of petitions, but that they were more concerned with the testimony they had heard regarding signature fraud.

Furthermore, as mentioned in the previous section on the residency requirement, in 1994 approximately 17,000 petition signatures were invalidated. A subsequent investigation revealed that payment per signature was an issue in the 1994 incident.

The appellants have produced no evidence that payment by the hour, rather than on commission, would in any way burden their ability to collect signatures. The appellants have only offered bare assertions on this point. While it may be argued that such assertions may establish an unacceptable burden on signature-gathering where the state cannot offer any evidence demonstrating the need to prohibit commission payments, C.f. Meyer, 486 U.S. at 424, 426, when the state introduces evidence justifying the ban on commission payments as a necessary means to prevent fraud and abuse (as the state has in this case), initiative sponsors may not rest on bare assertions alone.

The appellants also claim a violation of the Equal Protection Clause, arguing that they are being treated and regulated differently from lobbyists. However, there has been no showing that appellants are a protected class. Moreover, there are a number of similar regulations that have been imposed on lobbyists. See N.D.Cent. Code § 54-

05.1-06 (1989) (making it illegal for lobbyists to work on contingency that measure would be passed or defeated).

In light of the State's important interest in preventing signature fraud, the evidence of fraud the State has produced, and the lack of any evidence from the appellants showing that the ban on commissioned payment burdens their ability to collect signatures, this case is distinguishable from both the Maleng and Initiative cases. The record reveals sufficient evidence regarding signature fraud to justify the State's prohibition on commission payments.

## III. CONCLUSION

For the foregoing reasons, there are no constitutional infirmities with the North Dakota laws requiring petition circulators to be state residents and prohibiting payment of circulators on commission. We therefore affirm the judgment of the district court.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-8-