*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.gov.*

# THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| RESOURCE DEVELOPMENT COUNCIL FOR ALASKA, INC.; ALASKA TRUCKING ASSOCIATION, INC.; ALASKA MINERS ASSOCIATION, INC.; ASSOCIATED GENERAL CONTRACTORS OF ALASKA; ALASKA CHAMBER; and ALASKA SUPPORT INDUSTRY ALLIANCE, | Supreme Court Nos. S-17834/17843 (Consolidated)<br><br>Superior Court No. 3AN-20-05901 CI<br><br>O P I N I O N<br><br>No. 7554 – September 3, 2021 |
| Appellants and Cross-Appellees, | |
| v. | |
| VOTE YES FOR ALASKA'S FAIR SHARE, | |
| Appellee and Cross-Appellant, | |
| v. | |
| STATE OF ALASKA, OFFICE OF LIEUTENANT GOVERNOR, and LIEUTENANT GOVERNOR KEVIN MEYER, in an official capacity; and DIVISION OF ELECTIONS, and DIRECTOR GAIL FENUMIAI, in an official capacity, | |
| Appellees and Cross-Appellees. | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Thomas A. Matthews, Judge.

Appearances: Matthew Singer and Lee C. Baxter, Schwabe, Williamson & Wyatt, P.C., Anchorage, for Appellants and Cross-Appellees. Katherine Demarest and Margaret Paton Walsh, Assistant Attorneys General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for State of Alaska Appellees. Robin O. Brena and Jack S. Wakeland, Brena, Bell & Walker, P.C., Anchorage, for Appellee and Cross-Appellant Vote Yes for Alaska's Fair Share.

Before: Bolger, Chief Justice, Winfree, Maassen, and Carney, Justices, and Matthews, Senior Justice.[*] [Borghesan, Justice, not participating.]

MAASSEN, Justice.
MATTHEWS, Senior Justice, concurring in part.

## I. INTRODUCTION

This case involves a challenge to the lieutenant governor's decision that the sponsors of an initiative, "An Act changing the oil and gas production tax for certain fields, units, and nonunitized reservoirs on the North Slope," had collected enough signatures to allow the initiative to appear on the ballot in the 2020 general election. Entities opposed to the initiative argue that signatures should not be counted because the signature gatherers — the circulators — falsely certified that their compensation complied with Alaska election law.

The statute governing circulator compensation allows them to be paid no more than "$1 a signature." The superior court decided that this statute was

---

[*] Sitting by assignment made under article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

unconstitutional because it imposed an unreasonable burden on core political speech —
"interactive communication concerning political change." It therefore concluded that the
lieutenant governor properly counted the challenged signatures and properly certified the
initiative petition for the ballot. The entities opposed to the initiative filed this appeal.

We heard oral argument in August 2020 and on August 31 issued a
summary order affirming the superior court's judgment. This opinion explains our
decision.

## II. FACTS AND PROCEEDINGS

### A. Statutory Overview

The Alaska Constitution grants citizens the power to enact laws by
initiative.[1] The initiative process begins when initiative sponsors submit an application
to the lieutenant governor.[2] If the application and proposed bill satisfy constitutional and
statutory requirements, the lieutenant governor certifies the proposed initiative and prints
petition booklets to be circulated for signature gathering.[3] During this step, the sponsors
attempt to collect the signatures of qualified voters "equal in number to 10 percent of
those who voted in the preceding general election," representing "at least three-fourths
of the house districts of the state," with each of those house districts providing signatures
"equal in number to at least seven percent of those who voted in the preceding general

---

[1] Alaska Const. art. XI, § 1; *see* AS 15.45.010 ("Provision and scope for use
of the initiative").

[2] AS 15.45.020.

[3] AS 15.45.070 ("Review of application for certification"); AS 15.45.030
("Form of application"); AS 15.45.090 ("Preparation of petition"); AS 15.45.080 ("Bases
of denial of certification"); 6 Alaska Administrative Code (AAC) 25.240 (2021)
("Initiative, referendum, and recall petitions").

election in the house district."[4]

Signature gatherers, called circulators, are required to follow the rules set out in AS 15.45.110.[5] Subsection (c) of that statute is central to this appeal. It provides: "A circulator may not receive payment or agree to receive payment that is greater than $1 a signature, and a person or an organization may not pay or agree to pay an amount that is greater than $1 a signature, for the collection of signatures on a petition." Alaska Statute 15.45.110(e) provides that a violation of subsection (c) is a class B misdemeanor.[6]

The signatures collected in the petition booklets are submitted "as a single instrument" called the petition.[7] Within 60 days of submission, the lieutenant governor must review the petition to determine whether it was properly filed.[8] Alaska Statute 15.45.130 imposes a number of requirements on the process, including that circulators certify their compliance with AS 15.45.110(c). Alaska Statute 15.45.130 states, in relevant part:

> Before being filed, each petition shall be certified by an affidavit by the person who personally circulated the petition. In determining the sufficiency of the petition, the lieutenant governor may not count subscriptions on petitions not properly certified at the time of filing or corrected before the subscriptions are counted. The affidavit must state in

---

[4] AS 15.45.140(a).

[5] *See* AS. 15.45.130 (requiring circulator affidavits stating circulator's qualifications and attesting to circulator's compliance with signature-gathering requirements).

[6] "A person or organization that violates (c) or (d) of this section is guilty of a class B misdemeanor." AS 15.45.110(e).

[7] 6 AAC 25.240(c).

[8] AS 15.45.150.

substance . . . (6) *that the circulator has not entered into an agreement with a person or organization in violation of AS 15.45.110(c) . . . .*

(Emphasis added.)

### B.     Factual Background[9]

Vote Yes for Alaska's Fair Share (Fair Share) filed a petition to place its initiative, 19OGTX, "An Act changing the oil and gas production tax for certain fields, units, and nonunitized reservoirs on the North Slope," on the statewide ballot. The lieutenant governor approved Fair Share's application in October 2019, and the Division accordingly printed petition booklets for circulation. Fair Share hired a professional signature-gathering company, Advanced Micro Targeting, Inc., to circulate the petition booklets and obtain the required signatures. Fair Share eventually submitted 786 petition booklets in support of the initiative; 544 of these were from circulators employed by Advanced Micro Targeting.

In March 2020 the lieutenant governor sent a letter informing Fair Share that its initiative petition had been "properly filed" and would be placed on the 2020 general election ballot.

### C.     Proceedings

Six entities opposed to the initiative (which we refer to collectively as "Resource Development Council," the first one named) filed a complaint in superior court challenging the lieutenant governor's decision that the initiative could be placed on the ballot. Resource Development Council asserted that the circulators employed by Advanced Micro Targeting were paid more than $1 a signature in violation of AS 15.45.110(c). It alleged that Fair Share paid Advanced Micro Targeting $72,500,

---

[9]     At the motion to dismiss stage of litigation the court must treat "all factual allegations [of the complaint] as true." *Larson v. State, Dep't of Corr.*, 284 P.3d 1, 6 (Alaska 2012).

that Advanced Micro Targeting offered to pay circulators "$3,500-$4,000 per month plus bonus, and that it expected 80-100 signatures per day, six days per week in return for such compensation." Resource Development Council characterized the legal issue as "a math question": Assuming a circulator works 26 days in a month and gathers 90 signatures a day, a circulator who is paid $3,750 a month receives $1.60 a signature, more than the amount allowed by statute.

Resource Development Council alleged that the affidavits of Fair Share's petition circulators, submitted with its petition booklets, were necessarily untruthful because they certified that the circulators had complied with AS 15.45.110(c) despite having received payment of more than $1 a signature. Resource Development Council contended that because the affidavits were untruthful, the lieutenant governor was wrong to find the petition signatures "properly certified." It asked for a declaratory judgment that "petition booklets that are supported by false circulator affidavits have not been properly certified under AS 15.45.130 and that the signatures in those booklets may not be counted" and injunctive relief ordering the lieutenant governor to "invalidate those petition booklets and all subscriptions contained within those booklets as not properly certified."

The State moved to dismiss the action, and Fair Share filed its own motion to dismiss a few weeks later. After limited discovery, Resource Development Council cross-moved for partial summary judgment.

The superior court held oral argument, then granted the State's and Fair Share's motions to dismiss in a comprehensive written order. The court first concluded, based on the plain language and legislative history of AS 15.45.110(c), that the payment restriction of $1 per signature was unambiguous; the statute imposed a "hard limit" on all forms of circulator compensation, including hourly wages and salaries. Thus, "if a

circulator received payment that ended up being greater than $1 per signature, no matter how it was received, it seems the statute would prohibit it."

Given this reading of the statute, the court next considered whether the hard limit on compensation violated the free speech protections of the Alaska and federal constitutions.[10] Applying strict scrutiny, the court concluded that because the provision was not narrowly tailored to meet the State's compelling interests, it was an unconstitutional infringement on free speech. The court then rejected Resource Development Council's request for an injunction invalidating the challenged signatures on grounds that the petitions had not been "properly certified" as required by AS 15.45.130. The court held that the term "properly certified" "means that the petition is 'complete' and contains the proper signatures of Alaskan voters." It concluded that invalidating signatures because of flaws in circulator affidavits would unduly penalize Alaska voters who had no way of knowing how circulators were being paid or what they said in their affidavits.

Finally, anticipating an appeal, the court gave an alternative ground for its holding: that the mandate of AS 15.45.130 requiring the lieutenant governor to reject signatures because of a circulator's failure to properly certify them was also an unconstitutional restriction on free speech. The court concluded that the statutory remedy — effectively disenfranchising voters who had no control over the circulator's certification — was not narrowly tailored to address the State's legitimate interests and instead "operate[d] like a sledgehammer on a mosquito."

---

[10] *See* U.S. Const. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."); Alaska Const. art. I, § 5 ("Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right.").

Resource Development Council and Fair Share both appealed. Resource Development Council challenges the superior court's decision that the lieutenant governor properly certified the petitions and allowed the initiative to appear on the ballot. Fair Share challenges the superior court's decision that AS 15.45.110(c) is unconstitutional; it argues that the statute is susceptible of a constitutional construction that allows circulators to be paid by methods other than per signature.

The State argues that the dispositive issue in this appeal is whether the lieutenant governor "properly certified" the signatures; if so, it argues, we need not reach arguments about the statute's constitutionality.

## III. STANDARD OF REVIEW

We review grants of motions to dismiss de novo.[11] We apply our own "independent judgment to questions involving the constitutionality of a statute 'and will adopt the rule of law which is most persuasive in light of precedent, reason, and policy.' "[12]

## IV. DISCUSSION

Our analysis and conclusion largely follow those of the superior court. We first conclude that the "$1 a signature" limit of AS 15.45.110(c), by the statute's plain language and legislative history, is intended to be a hard cap on all types of compensation. Second, we hold that the $1 a signature limit, as a hard cap, is an unconstitutional restriction on core political speech. Finally, because AS 15.45.110(c), an unconstitutional statute, is the basis for Resource Development Council's argument that the petitions were not properly certified, we hold that the lieutenant governor did properly certify the petitions.

---

[11]     *DeRemer v. Turnbull*, 453 P.3d 193, 196 (Alaska 2019).

[12]     *Valentine v. State*, 215 P.3d 319, 322 (Alaska 2009) (quoting *State v. Murtagh*, 169 P.3d 602, 606 (Alaska 2007)).

**A.** **Alaska Statute 15.45.110(c)'s "$1 A Signature" Limit On Circulator Compensation Is A Hard Cap On All Types Of Compensation.**

Our first task is to interpret the plain language of AS 15.45.110(c). The provision reads: "A circulator may not receive payment or agree to receive payment that is greater than $1 a signature, and a person or an organization may not pay or agree to pay an amount that is greater than $1 a signature, for the collection of signatures on a petition." The parties disagree on the statute's proper interpretation. The reading advanced by Resource Development Council — and accepted by the superior court — is that the statute prohibits a circulator from receiving payment that totals more than $1 per signature collected regardless of how the circulator is paid; thus, a circulator who collects 200 signatures may be paid no more than $200 regardless of the amount of time and effort put into collecting those 200 signatures. The alternative interpretation, advanced by the State and Fair Share, is that the $1 a signature limit applies only when the circulator's compensation is based on the number of signatures collected. This interpretation allows for other compensation methods — for example, an hourly wage or a salary — that are not calculated on a per-signature basis and therefore may exceed $1 a signature.

"When determining a statute's meaning, we consider three factors: 'the language of the statute, the legislative history, and the legislative purpose behind the statute.' "[13] "We begin with the text and its plain meaning, and we use a 'sliding-scale approach' to interpret the language. '[T]he plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be.' "[14]

---

[13] *Cora G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 461 P.3d 1265, 1277 (Alaska 2020) (quoting *Alaska Ass'n of Naturopathic Physicians v. State, Dep't of Commerce,Cmty. & Econ. Dev.*, 414 P.3d 630, 634 (Alaska 2018)).

[14] *State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 992 (Alaska (continued...)

### 1. Plain language

First, we agree with the superior court's conclusion that "[t]he plain meaning of the words [of AS 15.45.110(c)] suggest[s] no ambiguity." The statutory cap is not restricted to per-signature payment methods, though the legislature could have drafted the statute that way; rather, the cap applies to a circulator's "payment" without suggesting that there might be exceptions. The statute's plain language supports only the interpretation that the $1 per signature cap is a hard cap that applies regardless of how the circulator is paid.

### 2. Legislative history

Considering the statute's unambiguous language, legislative history supporting a contrary intent must be very convincing before we will conclude that the statute means other than what it says.[15] But the legislative history only bolsters our conclusion that the statute is intended to apply a hard cap to all forms of circulator payment.

As introduced in the Senate in 1998, Senate Bill 313 prohibited circulator payment calculated on a per-signature basis while expressly allowing other payment methods:

> A sponsor may not receive payment or agree to receive payment, and a person or an organization may not pay or agree to pay, for the collection of signatures on a petition if any part of the payment is based on the number of signatures collected. *This subsection does not prohibit a sponsor from*

---

[14] (...continued)
2019) (alteration in original) (internal citation omitted) (first quoting *Ward v. State, Dep't of Pub. Safety*, 288 P.3d 94, 98 (Alaska 2012); then quoting *State v. Fyfe*, 370 P.3d 1092, 1095 (Alaska 2016)).

[15] *Id.*

*being paid an amount that is not based on the number of signatures collected.*[16]

Senator Bert Sharp, the bill's sponsor, explained in committee that while the bill prohibited per-signature compensation, "[p]ayment would still be allowed by the hour or any other method."[17] Likely referring to federal precedent,[18] Senator Sharp observed that a complete prohibition on "payments of any kind for obtaining signatures on an initiative" had been declared unconstitutional, but that — according to the advice of legislative counsel — "other states have at least prohibited payments by the signature, and that has stood up in court so far." Had the bill been passed into law in the form introduced by Senator Sharp, it would have categorically banned per-signature payment while explicitly exempting other payment methods from regulation.

But the bill language was amended in committee to change the flat ban on per-signature payment to the $1 a signature cap and to remove the language explicitly applying limitations to per-signature payment only.[19] The House Finance Committee's discussion of the bill focused on the constitutionality of a total payment ban and the merits of a signature-based compensation system. On the second day of discussion, Chairman Gene Therriault explained that the proposed amendment — which was ultimately adopted — "would allow you to pay per signature up to $1 per signature, but it would cap it at that amount. So [he] wanted to make it clear to individuals that that cap

---

[16]      S.B. 313, 20th Leg,. 2d. Sess. (1998) (emphasis added).

[17]      Hearing on S.B. 313 Before the Sen. Jud. Comm., 20th Leg., 2d Sess. at 25:58 (Mar. 18, 1998) (testimony of Sen. Bert Sharp).

[18]      *See Meyer v. Grant*, 486 U.S. 414, 428 (1988) (holding Colorado's flat ban on circulator payment unconstitutional).

[19]      H. Committee Substitute for Senate Bill (H.C.S.S.B.) 313, 20th Leg., 2d Sess. (1998).

on the payment has not been found to be unconstitutional. An outright ban of any payment has been found to be unconstitutional."[20]

Representative John Davies objected to the amendment; he favored requiring an hourly or daily compensation method out of concern that per-signature compensation schemes encourage "in your face and overly aggressive" circulators: "If . . . they're going to get paid by the piece and by each signature, they're going to be much more aggressive about going after every individual person out there than otherwise."[21] He saw the amendment as imposing a limit on all forms of compensation, unlike the bill's original language: "[T]he amendment would limit the amount of money that you could pay, [whereas] the existing language only limits the way in which you make payment.[22] Representative Davies thought the amendment language was more likely to be subject to a constitutional challenge.[23] But the amendment passed, and the bill as amended was enacted into law.[24]

In 2009 several representatives introduced a bill to amend the initiative statutes in various ways.[25] The proposed amendment included changes to the wording of AS 15.45.110(c): removing the "$1 a signature" cap, prohibiting any payment "based on the number of registered voters who signed the petition," and expressly allowing

---

[20]     Hearing on S.B. 313 Before the H. Fin. Comm., 20th Leg., 2d Sess. at 32:40 (May 8, 1998) (statement of Rep. Gene Therriault).

[21]     *Id.* at 34:16 (statement of Rep. John Davies).

[22]     *Id.* at 36:33.

[23]     *Id.* at 36:48.

[24]     *Id.* at 38:00; Ch. 80, § 2, SLA 1998.

[25]     House Bill (H.B.) 36, 26th Leg., 1st Sess. (Jan. 20, 2009).

circulator payment based on "an hourly wage or salary."[26] This language was deleted before any hearings.[27]

This legislative history falls far short of convincing us that the legislature, when it enacted AS 15.45.110(c) in 1998, intended the payment cap to cover only one type of circulator compensation — payment by the signature — while allowing other payment methods. Legislative history in fact supports the superior court's conclusion that the statute means what it says.

### 3. The canon of constitutional avoidance

"If an ambiguous text is susceptible to more than one reasonable interpretation, of which only one is constitutional, the doctrine of constitutional avoidance directs us to adopt the interpretation that saves the statute."[28] Fair Share and the State rely on this doctrine to argue that AS 15.45.110(c) should be narrowly construed to avoid an unconstitutional interpretation. The superior court rejected this analytical approach, concluding that the statute's plain language would not allow it.

We agree with the superior court. The plain language of Alaska's statute, as explained above, applies the per-signature cap without exception. Because the plain language of the statute is unambiguous and legislative history does not contradict the statute's plain meaning, there is only one reasonable interpretation of the statute. If that one reasonable interpretation means that the statute is unconstitutional — which is what

---

[26] *Id.* § 5.

[27] Sponsor Substitute for House Bill (S.S.H.B.) 36; 2009 House Journal 582; *see* Ch. 73 SLA 2010. We have noted the difficulty in finding any "interpretive significance" in legislative inaction. *Univ. of Alaska v. Tumeo*, 933 P.2d 1147, 1156 (Alaska 1997) ("Silence can be evidence of intent; however, it is difficult to decipher what is meant when nothing has been said.").

[28] *State v. Planned Parenthood of the Great Nw.*, 436 P.3d 984, 992 (Alaska 2019).

we conclude in the discussion that follows — the statute cannot be saved by a strained reading.

> [W]e may not read into a statute that which is not there, even in the interest of avoiding a finding of unconstitutionality, because "the extent to which the express language of the provision can be altered and departed from and the extent to which the infirmities can be rectified by the use of implied terms is limited by the constitutionally decreed separation of powers which prohibits this court from enacting legislation or redrafting defective statutes."[29]

We conclude that the canon of constitutional avoidance is inapplicable and that we therefore must consider the statute's constitutionality.[30]

**B.    Alaska Statute 15.45.110(c)'s "$1 A Signature" Cap On All Types Of Compensation Is An Unconstitutional Restriction On Political Speech.**

### 1.    Legal framework

In *Meyer v. Grant* the United States Supreme Court applied an exacting scrutiny standard to a Colorado statute that made it a felony to pay people for circulating initiative petitions.[31]  The Court held that the statute violated the First and Fourteenth Amendments, arriving at that conclusion through essentially four steps that are helpful

---

[29]    *Alaskans for a Common Language, Inc. v. Kritz*, 170 P.3d 183, 192 (Alaska 2007) (quoting *State v. Campbell*, 536 P.2d 105, 111 (Alaska 1975), *overruled on other grounds by Kimoktoak v. State*, 584 P.2d 25, 31 (Alaska 1978)).

[30]    *See Doe v. Dep't of Pub. Safety*, 444 P.3d 116, 139 n.16 (Alaska 2019) (Bolger, C.J., dissenting) ("If a statute is susceptible of no reasonable construction avoiding constitutional problems, this court is under a duty to nullify the statute or, if possible, the particular provision found offensive to the constitution." (quoting *Kritz*, 170 P.3d at 196 n.54)).

[31]    486 U.S. 414, 415-16, 420 (1988).

in our analysis of the issues on this appeal.[32]

First, the Court found that the act of circulating a petition is an exercise of core political speech and falls within that fundamental right.[33] Circulating a petition necessarily involves "both the expression of a desire for political change and a discussion of the merits of the proposed change."[34] A petition circulator "will at least have to persuade [potential signers] that the matter is one deserving of the public scrutiny and debate that would attend its consideration by the whole electorate. This will in almost every case involve an explanation of the nature of the proposal and why its advocates support it."[35] This type of "interactive communication concerning political change . . . is appropriately described as 'core political speech.' "[36]

Second, the Court identified two ways the Colorado statute burdened this core political speech: (1) by limiting "the number of voices who will convey [initiative proponents'] message and the hours they can speak and, therefore, limit[ing] the size of the audience they can reach," and (2) by making it "less likely that [initiative proponents] will garner the number of signatures necessary to place the matter on the ballot, thus

---

[32] *Id.* at 416. The test articulated in *Meyer* is no less protective of free speech rights in this context than we would find to be the case under the Alaska Constitution. We therefore do not analyze the issues separately under state and federal law. *Cf. In re Tiffany O.*, 467 P.3d 1076, 1081 n.16 (Alaska 2020) (explaining that analysis of faith-based objections to medical treatment would be analyzed under Alaska Constitution's free exercise clause because we have interpreted it to require more protective standard than federal law interpreting First Amendment).

[33] *Meyer*, 486 U.S. at 421-22.

[34] *Id.* at 421.

[35] *Id.*

[36] *Id.* at 421-22.

limiting their ability to make the matter the focus of statewide discussion."[37]  The Court held that because the payment ban "trenches upon an area in which the importance of First Amendment protections is at its zenith[,] . . . the burden that Colorado must overcome to justify this criminal law is well-nigh insurmountable."[38]

Third, the Court noted Colorado's justifications for the payment ban:  its interests in ensuring grassroots support for state-wide initiatives and protecting the integrity of elections.[39]

Fourth, the Court held that the State failed to demonstrate that its concerns justified the law's burden on political expression.[40]  The Court observed that the state interest in ensuring grassroots support was already met by the requirement that initiatives have the support of a certain number of signers.[41]  And the Court held that the state interest in protecting the integrity of the election process did not make it "necessary to burden appellees' ability to communicate their message."[42]  The Court saw no evidence supporting the proposition that a professional circulator would be more likely than a volunteer to accept false signatures; it noted that other provisions of the statute provided criminal sanctions that already "deal expressly with the potential danger that circulators

---

[37]     *Id.* at 422-23.  The Court took "judicial notice of the fact that it is often more difficult to get people to work without compensation than it is to get them to work for pay."  *Id.* at 423 (quoting *Urevich v. Woodard*, 667 P.2d 760, 763 (Colo. 1983)).

[38]     *Id.* at 425 (quoting *Grant v. Meyer*, 828 F.2d 1446, 1447 (10th Cir. 1987)).

[39]     *Id.*

[40]     *Id.*

[41]     *Id.* at 425-26.

[42]     *Id.* at 426.

might be tempted to pad their petitions with false signatures."[43] Further, according to the Court, "the risk of fraud or corruption, or the appearance thereof, is more remote at the petition stage of an initiative than at the time of balloting."[44] The Court concluded that the complete prohibition on payment thus failed to withstand exacting scrutiny and was unconstitutional.[45]

Several appeals courts later considered less restrictive laws under a less demanding standard. In 2006 the Ninth Circuit Court of Appeals reviewed an Oregon initiative amending the state constitution to prohibit per-signature payment for circulators while explicitly allowing other forms of compensation.[46] Because the law was not as restrictive as the one at issue in *Meyer*, the court analyzed the initiative using a framework the Eighth Circuit Court of Appeals had adopted in *Initiative & Referendum Institute v. Jaeger*, involving North Dakota's similar prohibition of only per-signature payment.[47] The *Jaeger* court noted that while "[s]evere burdens on speech trigger an exacting standard in which regulations must be narrowly tailored to serve a compelling

---

[43]    *Id.* at 426-27 (noting that it was "a crime to forge a signature on a petition," "to make false or misleading statements relating to a petition," "or to pay someone to sign a petition," and that each page of the petition must warn voters not to sign the petition unless they understood the initiative and that forging a signature would be a felony).

[44]    *Id.* at 427.

[45]    *Id.* at 420, 428.

[46]    *Prete v. Bradbury*, 438 F.3d 949, 952 (9th Cir. 2006). The initiative read: "It shall be unlawful to pay or receive money or other thing of value based on the number of signatures obtained on an initiative or referendum petition. Nothing herein prohibits payment for signature gathering which is not based, either directly or indirectly, on the number of signatures obtained." Or. Const. art. IV, § 1b.

[47]    *Prete*, 438 F.3d at 963 (citing *Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614 (8th Cir. 2001)).

state interest, . . . lesser burdens receive a lower level of review."[48]

The Eighth Circuit in *Jaeger* determined that the prohibition of only per-signature compensation imposed just such a "lesser burden" because it merely regulated one payment method without banning payment entirely as in *Meyer*.[49] The court concluded that the state "ha[d] produced sufficient evidence that the regulation [was] necessary to insure the integrity of the initiative process."[50] And the Ninth Circuit followed suit in *Prete*, deciding that the similar Oregon initiative also imposed a "lesser burden" and therefore should be given a " 'less exacting review' under which an 'important regulatory interest[]' will support a finding that the measure is a 'reasonable, nondiscriminatory restriction[].' "[51] The court upheld the initiative under this "less exacting review," concluding that the state had met its burden of proving that the law was reasonably related to an "important regulatory interest in preventing fraud and forgery in the initiative process" while the plaintiffs were unable to prove that the law significantly burdened their ability to collect signatures.[52]

The Sixth Circuit Court of Appeals applied the same framework to reach a different conclusion in *Citizens for Tax Reform v. Deters*.[53] Backers of a proposed constitutional amendment challenged an Ohio statute that prohibited the receipt of

---

[48] *Jaeger*, 241 F.3d at 616 (first citing *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358-59 (1997); then citing *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 208 (1999) (Thomas, J., concurring)).

[49] *Id.* at 617.

[50] *Id.* at 618.

[51] *Prete*, 438 F.3d at 968 (alterations in original) (quoting *Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1008 (9th Cir. 2003)).

[52] *Id.* at 970-71.

[53] 518 F.3d 375 (6th Cir. 2008).

compensation for circulating initiatives "on a fee per signature or fee per volume basis" and also prohibited the payment of compensation "except on the basis of time worked."[54] The challengers asserted that its political consulting firm was only willing to work on a fix-fee contract based on a per signature or per volume basis; the statute "increased the cost of qualifying [the challengers'] proposed amendment, made it more difficult to raise money necessary to fund the initiative effort, and [caused them to refrain] from attempting to qualify the proposed amendment for the ballot so long as the Statute was in force."[55]

The Sixth Circuit Court of Appeals reviewed *Jaeger*, *Prete*, and a Second Circuit case — *Person v. New York State Board of Elections*[56] — that had followed *Jaeger* and *Prete* to uphold a similar ban on per-signature compensation.[57] From these cases the court concluded, first, that the question of "the character and magnitude of the burden created by" the challenged law was "fact-intensive," as restrictions on circulator payment could "impact political expression in at least three related but distinct ways": (1) reducing "the number and hours of voices which will convey the message"; (2) limiting the size of the petition's audience; and (3) lowering "the likelihood that a measure will qualify for the state wide ballot."[58] The court observed that "[a] circulator plays a crucial role in the petition process because the circulator both has to express the petitioner's desire for political change and has to discuss the merits of the proposed

---

[54] *Id.* at 377-78; Ohio Rev. Code Ann. § 3599.111(B), (D) (West 2021).

[55] *Deters*, 518 F.3d at 378.

[56] 467 F.3d 141 (2d Cir. 2006).

[57] *Deters*, 518 F.3d. at 381-83.

[58] *Id.* at 383.

change."[59] And finally, the court recognized that "the availability of other payment methods might reduce the burden, [but] the extent to which the more effective means are foreclosed is an important consideration."[60]

The Sixth Circuit next reviewed the record and concluded that there was "no genuine issue of material fact (1) that Ohio's per-time-only requirement would make proposing and qualifying initiatives more expensive" by, among other things, barring fixed-price contracts, making it difficult to predict a campaign's cost, and decreasing circulator incentive; "and (2) that professional coordinators and circulators would likely not work under a per-time-only system."[61] Weighing the significance of this burden, the court determined that "the broader ban on the types of payment and harsher criminal sanctions for violations" meant that the Ohio statute "lies closer to the complete ban in *Meyer* than the partial bans in the other circuit court cases."[62] The burden on the exercise of core political speech was therefore "significant."[63] Subjecting the statute to "exacting scrutiny" review, the court was unconvinced by the state's argument that the statute was narrowly tailored to advance a compelling interest in eliminating election fraud, and it affirmed the lower court's judgment that the statute was unconstitutional.[64]

We have not addressed the specific issue of circulator payment before, but we have announced principles that parallel federal law and guide our analysis here.

---

[59] *Id.*

[60] *Id.*

[61] *Id.* at 383-85.

[62] *Id.* at 386.

[63] *Id.* at 386-87.

[64] *Id.* at 387-88.

"Speech relating to ballot initiatives . . . is entirely protected."[65]  We apply exacting scrutiny to core political expression.[66]  Under even exacting scrutiny, " 'a significant interference with protected rights . . .' may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of . . . freedoms."[67]  "[A] provision burdening the exercise of political speech must be 'narrowly tailored to serve a compelling state interest.' "[68]

### 2.    Analysis

Having determined that AS 15.45.110(c) imposed a flat $1 a signature cap regardless of payment method, the superior court went on to decide that this flat cap amounted to an unconstitutional restriction on political speech.  We agree.

The legal question presented falls squarely within the Supreme Court's exacting scrutiny framework in *Meyer v. Grant*.[69]  First, "[p]etition circulation . . . is 'core political speech,' because it involves 'interactive communication concerning political change.' "[70]  "First Amendment protection for such interaction . . . is 'at its

---

[65]     *State v. Alaska Civil Liberties Union*, 978 P.2d 597, 606-07 (Alaska 1999).

[66]     *Id.* at 603 (stating that "limitations on core First Amendment rights of political expression" must satisfy exacting scrutiny (quoting *Buckley v. Valeo*, 424 U.S. 1, 44-45 (1976), *superceded by statute on other grounds as recognized in McConnel v. FEC*, 540 U.S. 93 (2003))).

[67]     *Id.* (first alteration in original) (quoting *Buckley*, 424 U.S. at 25).

[68]     *Id.* (quoting *Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 657 (1990), *rev'd on other grounds by Citizens United v. FEC*, 558 U.S. 310 (2010)).

[69]     486 U.S. 414, 421-28 (1988).

[70]     *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 186 (1999) (quoting *Meyer*, 486 U.S. at 422).

zenith.' "[71]

As the superior court concluded, a hard cap on circulator compensation burdens this core political speech by "significantly inhibit[ing] communication about proposed political change." In reaching this conclusion the court acknowledged some of the unique geographic challenges that initiative sponsors face in Alaska, especially given the statutory requirement that they obtain signatures from a certain percentage of voters in three-fourths of the state's house districts[72] — meaning that "[i]t is not enough for a circulator to stand on the sidewalk in front of a shopping mall in Anchorage and gather signatures." The court gave a pointed example of these challenges by contrasting House Districts 20 and 32:

> District 20 covers Downtown Anchorage while District 32 covers Kodiak, Cordova and Seldovia. The required number of signatures for an initiative (7%) is roughly the same [in these two districts] (413 vs 439), but the effort necessary to assure the minimum number of signatures from each district is far different.

A circulator could perhaps obtain scores of signatures in an hour by standing on the right street corner at the right time in downtown Anchorage. But to get the same number in a geographically vast house district with isolated and relatively small population centers, like District 32, would require significantly more time, travel, and effort, and payment of $1 a signature would unlikely be sufficient to attract anyone other than the most devoted volunteer. These challenges would likely reduce the number of people initiative sponsors could reach and make it less likely that the sponsors would be able to secure enough signatures within the required time to place the initiative on the ballot. The

---

[71]     *Id.* at 187 (quoting *Meyer*, 486 U.S. at 425).

[72]     *See* AS 15.45.140.

superior court correctly recognized that the $1 a signature cap, by thus burdening core political speech, was subject to exacting scrutiny.

Resource Development Council argues that the record is devoid of any evidence of a particular burden on Alaskans' free speech rights, and the State agrees. They point out that in *Meyer* the factual record had been developed at trial, while in *Prete* both sides presented affidavits in a preliminary injunction proceeding. Here, in contrast, the superior court made its decision at an early stage of the litigation based on the allegations in the pleadings and on exhibits consisting only of legislative history materials. But we are not persuaded that factual development through discovery was necessary. The facts underlying the superior court's finding of a burden on core political speech — consisting primarily of observations about state geography — are clearly subject to judicial notice[73] and not seriously disputed.

Resource Development Council also challenges the court's finding of a significant burden on free speech by arguing that there are more efficient ways of gathering signatures than flying around the state at great expense; circulators could be posted at hub airports, Costco stores, regional hospitals, and other sites where residents of "far-flung house districts" may typically be found passing through or temporarily

---

[73]     *See, e.g., Edgmon v. State, Office of Lieutenant Governor, Div. of Elections*, 152 P.3d 1154, 1158 (Alaska 2007) (in recount appeal, taking "judicial notice that unlike some communities in the state, Anchorage is a community with home [mail] delivery for a significant portion of its residents"); *Varilek v. City of Houston*, 104 P.3d 849, 852 (Alaska 2004) (noting that "Alaska's geographic and political boundaries" are subject to judicial notice); *Kenai Peninsula Borough v. State*, 743 P.2d 1352, 1370 n.34 (Alaska 1987) (taking judicial notice of Anchorage population in context of legislative reapportionment challenge); *Fischer v. Stout*, 741 P.2d 217, 221 n.7 (Alaska 1987) (in recount appeal, taking "judicial notice that human beings are of insufficiently diminutive stature to dwell comfortably" in post office boxes); *cf. Meyer*, 486 U.S. at 423 ("We can take judicial notice of the fact that it is often more difficult to get people to work without compensation than it is to get them to work for pay." (quoting *Urevich v. Woodard*, 667 P.2d 760, 763 (Colo. 1983))).

residing.  Resource Development Council also suggests that initiative sponsors could mail petition booklets to rural Alaska and have the signed booklets mailed back, pointing to ongoing and signature-gathering efforts in a statewide recall campaign using unpaid volunteer circulators.

But we must give exacting scrutiny to any law that reduces the size of the audience initiative sponsors can reach with their message.  In *Meyer*, when the U.S. Supreme Court analyzed Colorado's full ban on circulator compensation, it concluded that the law burdened free speech by making it less likely that the sponsors would "garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion."[74]  Those same concerns exist here, as the superior court explained, quoting *Meyer*:[75]

> The same fundamental policies that caused the Supreme Court to take pause similarly apply when a circulator can be paid pocket change as opposed to no pay whatsoever:  the size of the audience proponents can reach is limited; it is less likely that proponents will garner the number of signatures necessary to place the matter on the ballot; and [this] limits their ability to "make the matter the focus of statewide discussion."

The superior court rightly recognized that the State has a compelling interest in "ensuring the integrity of the election process and preventing fraud."[76]  But as the Court held in *Meyer*, the means chosen to achieve the State's interests must be narrowly tailored. Alaska Statute 15.45.110(c) is not narrowly tailored because, unlike the statutes that

---

[74]     *Meyer*, 486 U.S. at 423.

[75]     *Id.* at 422.

[76]     *See Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) ("A State indisputably has a compelling interest in preserving the integrity of its election process." (quoting *Eu v. S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 231 (1989))).

survived less exacting scrutiny in *Prete v. Bradbury*[77] and *Initiative & Referendum Institute v. Jaeger*,[78] it "does not leave alternative methods for payment available" to initiative sponsors. And the State has other, less burdensome ways of countering fraud: the State may impose criminal sanctions, as evidenced by the existing statute,[79] that "deal expressly with the potential danger that circulators might be tempted to pad their petitions with false signatures."[80]

In sum, AS 15.45.110(c) significantly burdens core political speech and is not narrowly tailored to achieve the State's interests. Because it fails to meet *Meyer*'s exacting scrutiny standard, it is unconstitutional.

## C. The Petition Was "Properly Certified" Under AS 15.45.130.

Alaska Statute 15.45.130 requires the lieutenant governor to review an initiative petition to determine whether it "was properly or improperly filed" for purposes of the next step — placing it on the ballot. Among the statutory requirements for a properly filed petition is a certification by affidavit signed by "the person who personally circulated the petition."[81] "In determining the sufficiency of the petition, the lieutenant governor may not count subscriptions on petitions not properly certified at the time of

---

[77]     438 F.3d 949 (9th Cir. 2006).

[78]     241 F.3d 614 (8th Cir. 2001).

[79]     AS 15.45.110(e) ("A person or organization that violates (c) or (d) of this section is guilty of a class B misdemeanor.").

[80]     *Meyer*, 486 U.S. at 426-27; *see also Citizens for Tax Reform v. Deters*, 518 F.3d 375, 386 (6th Cir. 2008) (citing "harsher criminal sanctions for violations" as one reason Ohio statute "lies closer to the complete ban in *Meyer* than the partial bans [upheld] in the other circuit court cases").

[81]     AS 15.45.130.

filing or corrected before the subscriptions are counted."[82] A circulator's affidavit "must state in substance" a number of things, including "that the circulator has not entered into an agreement with a person or organization in violation of AS 15.45.110(c)," the "$1 a signature" payment cap.[83]

Resource Development Council argues that because the circulators were paid in violation of AS 15.45.110(c), their petition booklets were not "properly certified" and, under AS 15.45.130, the lieutenant governor was not allowed to count those booklets' signatures. However, it was not improper for the lieutenant governor to certify petitions that did not comply with an unconstitutional requirement. The petitions were "properly certified" for purposes of AS 15.45.130.

## V.    CONCLUSION

We AFFIRM the judgment of the superior court.

---

[82]    *Id.*

[83]    AS 15.45.130(6).

MATTHEWS, Senior Justice, concurring in part.

I agree with the result of today's opinion and with most of its reasoning. In particular, I agree that AS 15.45.110(c) was intended to apply a cap of $1 per signature to all types of compensation, that it unconstitutionally restricts political speech, and that a construction of the statute that narrows it so that it applies only to compensation measured on a signature basis should not be employed. But I do not agree that the language of the statute is "plain" in the sense that it could only apply to all forms of compensation. Instead I think that the statute is textually ambiguous, but that its legislative history makes its intended meaning clear and thus precludes a narrowing construction.

Alaska Statute 15.45.110(c) provides: "A circulator may not receive payment or agree to receive payment that is greater than $1 a signature, and a person or an organization may not pay or agree to pay an amount that is greater than $1 a signature, for the collection of signatures on a petition." In my view, the phrases "payment . . . greater than $1 *a signature*" and "an amount . . . greater than $1 *a signature*" (emphasis added) plausibly could refer only to payment arrangements on an "a signature" basis and not to arrangements that are hourly or salary based. There is a literal match between the statutory ban on paying or agreeing to pay more than $1 a signature and contracts calling for payment on an "a signature" basis. But it takes an additional mental step to apply the ban to hourly or salaried contracts. While the broader application is permitted by normal linguistic usage, it is not, in my opinion, required.

Moreover, the broader application can be applied only awkwardly to the prospective aspects of the statute. Subsection .110(c) forbids agreements to pay or receive more than $1 a signature. But no one entering into a contract to gather signatures on a salaried or hourly basis can know in advance whether the agreement will be legal or illegal. Legality will depend on an unknown and prospectively unknowable factor —

whether the number of signatures ultimately obtained will exceed or fall short of the pay in dollars ultimately earned under the contract.[1] This awkwardness suggests that subsection .110(c) was meant to apply only to per-signature compensation.

Additionally, while prohibitions on per-signature pay for signature gathering have been justified on the ground that this form of compensation creates an incentive for overbearing or fraudulent conduct on the part of the signature gatherers,[2] applying a $1 per-signature cap to hourly and salaried contracts cannot be justified on these grounds. Incentives encouraging undesirable conduct are created when caps are imposed on hourly or salaried circulators. Circulators may be moved to engage in overreaching or fraud upon realizing that their wages will be docked unless they pick up the pace of signature gathering. This too suggests that the cap was meant to apply only to per-signature contracts.

Notwithstanding these considerations, the legislative history of subsection .110(c) is persuasive, and makes it clear, in my opinion, that the $1 a signature limit was intended to apply to all forms of compensation. If the legislature had intended the subsection to apply only to pay on an "a signature" basis, surely the clarifying last sentence of the subsection as originally introduced would have been preserved.[3]

---

[1]    Implicit in the superior court's statement that "if a circulator received payment that ended up being greater than $1 per signature, no matter how it was received, it seems the statute would prohibit it" is a recognition that the legality of hourly or salaried pay for circulators cannot be determined in advance.

[2]    Hearing on S.B. 313 Before the House Fin. Comm., 20th Leg., 2d Sess., at 33:20-34:26 (May 8, 1998) (statement of Rep. John Davies); Opinion at 12; *see Prete v. Bradbury*, 438 F.3d 949, 969 (9th Cir. 2006) (summarizing state's evidence related to fraud if circulators are paid per signature); *Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614, 618 (8th Cir. 2001) (same).

[3]    S.B. 313, § 1(c), 20th Leg., 2d Sess. (Feb. 16, 1998) ("This subsection does
(continued...)

The fact that the meaning of the statute is not plain on its face, and only becomes clear when its legislative history is considered, does not mean that the court must employ the canon of constitutional avoidance when construing the statute, as Fair Share argues in its cross-appeal. The canon is a rule of interpretation and should not be used to impose a construction that is not plausibly within the intent of the legislature.[4] Here, as I have indicated, restricting the application of subsection .110(c) to per-signature contracts would be contrary to the clear intent of the legislature.

The canon of constitutional avoidance is one of several tools available to courts to avoid the total invalidation of statutes that are only partially either potentially or actually unconstitutional. It is, as I have noted, a rule of interpretation, and it can be used only to narrow a statute in a manner that is at least plausibly consistent with the legislative intent underlying the statute. The other most commonly used tool to avoid total invalidation of a statute is the doctrine of severability.[5]

---

[3]     (...continued)
not prohibit a sponsor from being paid an amount that is not based on the number of signatures collected.").

[4]     *DeBartolo v. Florida*, 485 U.S. 568, 575, 583-84 (1988) (stating that the rule of constitutional avoidance applies unless the proposed saving construction "is plainly contrary to the intent of Congress" and examining legislative history to determine congressional intent); *cf.* Richard H. Fallon, Jr., *Facial Challenges, Saving Constructions, and Statutory Severability*, 99 TEX. L. REV. 215, 231 (2020) ("[B]ecause saving constructions involve statutory interpretation, the acceptability of a proposed saving construction sometimes depends on contestable issues of interpretive methodology. These include such matters as the permissibility of reliance on legislative history . . . .").

[5]     *See* Fallon, *supra* note 4, at 220 ("[F]acial challenges have the potential to operate as 'wrecking ball[s].' In understandable revulsion from invalidating too many statutes on their faces — even when familiar tests of constitutional validity threaten them with condemnation — the Court has turned repeatedly to two limiting devices. One is
(continued...)

Severability applies only when a part of a statute, or an application of it, has been found unconstitutional. It is not a rule of interpretation since it operates contrary to the legislative intent that all parts of a statute remain in effect. Rather, it is a rule derived both from the judicial power[6] and from the general severability clause of AS 01.10.030.[7] Severability, as AS 01.10.030 makes clear, can apply not only to separate valid from invalid portions of a statute, but to separate valid from invalid applications of one provision of a statute.[8]

The test for severability asks two questions: (1) whether the portion or application of the statute remaining after the "offending portion of the statute" or the offending application of the statute "is severed" can be given legal effect and (2) whether

---

**5** (...continued)
'narrowing' or 'saving' constructions. The other is statutory 'separability' or 'severability'. . . ." (alteration in original) (citation omitted)).

**6** 2 NORMAN J. SINGER & J.D. SHAMBIE SINGER, STATUTES AND STATUTORY CONSTRUCTION, § 44:8, at 633 (7th ed. 2009) (stating that power of severability "flows from powers inherent in the judiciary").

**7** Alaska Statute 01.10.030 provides:
Any law heretofore or hereafter enacted by the Alaska legislature which lacks a severability clause shall be construed as though it contained the clause in the following language: "If any provision of this Act, *or the application thereof to any person or circumstance* is held invalid, the remainder of this Act *and the application to other persons or circumstances* shall not be affected thereby." [Emphasis added.]

**8** *See supra* note7 (emphasizing statutory provision for severance of unenforceable applications of statutes); *see also Fallon*, *supra* note 4, at 233 ("The concept of statutory severability presents many complexities. It can apply to denominated provisions of a statute, to linguistic subunits within a provision, or to a single provision's various applications.").

the legislature would have wanted the portion or application of the statute remaining "to stand" in the event other provisions or applications of the statute "held bad should fall."[9]

Fair Share and the State both argue that the canon of constitutional avoidance must be applied to restrict the application of subsection .110(c) to per-signature compensation to save that subsection from total invalidation. But neither argues that the doctrine of severability should be used to save valid applications of the statute if the canon does not apply. Because the issue of severability has not been raised or briefed it is properly considered to be waived in this case.

Applying waiver here is no mere technicality. Despite the fact that the canon of constitutional avoidance and the doctrine of severability are closely related in purpose, they require the resolution of distinctly different issues. Both aspects of the test for severability seem fairly debatable here. Thoughtful briefs and careful research would be required to decide (1) whether the legislature would have wanted subsection .110(c) to apply only to per-signature pay in light of the legislative rejection of that position in favor of a broader application that does not foster the anti-fraud and overreaching rationale that might justify the more narrow application; and (2) whether the subsection even as so limited would be constitutional.[10]

In summary, I disagree with the reasoning of the opinion of the court only insofar as I think the language of subsection .110(c) is ambiguous rather than plain.

---

[9] *Sonneman v. Hickel*, 836 P.2d 936, 941 (Alaska 1992).

[10] Courts are divided as to whether a state may ban or limit per-signature pay. *Compare Prete v. Bradbury*, 438 F.3d 949, 970-71 (9th Cir. 2006) (permitting ban as applied), *and Initiative & Referendum Inst. v. Jaeger*, 241 F.3d 614, 618 (8th Cir. 2001) (permitting ban), *with Citizens for Tax Reform v. Deters*, 518 F.3d 375, 388 (6th Cir. 2008) (precluding ban on all types of compensation other than "per-time-only"), *and Indep. Inst. v. Gessler*, 936 F. Supp. 2d 1256, 1280-81 (D. Colo. 2013) (precluding limitation on per-signature compensation).

Nonetheless, because the legislative history of the statute clearly shows the legislature's intent to apply the statute to all forms of compensation, I agree that the canon of constitutional avoidance should not be applied. I also believe that the State and Fair Share could have argued alternatively that the doctrine of severability, rather than the canon of constitutional avoidance, should be used to narrow the application of subsection .110(c) to per-signature agreements, but they did not do so and that issue is therefore properly considered waived. Other than as noted I join in the opinion of the court in all respects.